JULIUS C. BARTELS *v.* MAGGIE J. BARTELS.

No. 1947.

ARGUED APRIL 25, 1930.                    DECIDED JUNE 3, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PARSONS, J.

This is a divorce proceeding begun by libel dated July 30 and filed July 31, 1929, alleging wilful and utter desertion of the libellant by the libellee "for a continuous period of six months immediately prior to the institution of this suit." Decree was for the libellant upon the ground stated and the case is before us upon libellee's appeal from said decree.

Evidence was introduced tending to show *inter alia* the following facts: the parties were married December 9, 1916, and last lived together as husband and wife at Lanai City, Island of Lanai, County of Maui. In August, 1928, libellant took libellee to Honolulu and left her

there, later writing her not to return to Lanai. Libellee returned to Lanai and libellant sent her away, telling her that they "could not live together after her immoral conduct on Lanai." Libellee then returned to Honolulu. In October, 1928, libellant began proceedings for divorce against his wife on the ground of adultery, the libel being dismissed after a hearing on the merits, by decree entered December 22, 1928. Shortly prior to the institution of the divorce proceedings last above referred to the libellant had given his wife $1370. Thereafter under date of January 10, 1929, libellee wrote her husband as follows: "So you have dropped the case and everything is over. What are your intention? I'm coming home and please send me some money. Answer immediately." After receiving the above quoted letter libellant caught the first boat to Honolulu and on January 17 had an interview with his wife in which he asked her to consent to a divorce, offering to give her $50 a month if she would do so and to support her expected child. Libellee's testimony is that: "He came down and came in the room and he said to me 'What is your intention?' I said 'Nothing,' and 'I wrote to you; I want to come home.' And he said that 'if I was going home that the Hawaiian Pine Co., would put him off.' So I told him 'I wasn't going home for the Hawaiian Pine Co., I was going home for him.' Then he said 'Why don't you go home? If you go home the Hawaiian Pines will put me off.' And he told me 'to be sensible and he would give me $50.00 for my support and the baby and pay the hospital bill and things and give him a divorce.' So I said 'I am not asking for a divorce; I am asking for your help.' And he kept on nagging about the divorce, so I told him 'I had nothing to do with it * * *.'"

Libellant's testimony as to what occurred at the same interview is as follows: "I got this letter and I went to town, and went out and saw her, and explained the matter

to her of what had preceded, and then she insisted on coming home so I told her—I said 'Well, you know how people think—the public think—of your actions while you were there. Don't you think it is best for you to stay here for a while? I will take care of you, and give you an allotment, and take care of the child.' She said 'I don't care what the public think of me. I am coming home.' I said, 'All right. If you want to come home—come; I will send you the money.'" The same day the libellant returned on the steamer "Hawaii" to Lanai and on the following day, January 18, 1929, wrote the libellee as follows: "I hope you have made up your mind and is ready to give me your answer. If you decide the way we were talking about I will send you the money as soon I get your answer. I hope you will be sensible, you will not be sorry for it." As to the meaning of the expressions used in the foregoing letter the libellant, while testifying, was asked by the court: "To what were you referring when you said 'As soon as I get your answer; I hope you will be sensible.' What did you mean—coming together again as husband and wife, or her allowing you to have a divorce on terms—which was it, Mr. Bartels?" To which the libellant replied, "It was on the term of getting a divorce so that I could help take care of her and yet maintain my job; I wasn't certain, if she came to Lanai, they would keep me there on the job; and when we had that conversation I took it all up with her and explained it fully to her so that she could judge for herself."

On January 23 libellee replied to libellant's letter of January 18, as follows: "I received your letter of Jan. 18th. In regard to our conversation, I am still of the same opinion and as I am your legal wife, I ask you for a monthly allowance of 100.00 per mon. I need it for my support and for our unborn child. If you think you can't spare that amount just now, do send me some for the

present time so I can get things ready as my time is near. I do hope you'll realize, and too, think that I need your help. This will be all for the present time. Hope to hear from you soon." In response to the foregoing letter the libellant on January 29, 1929, sent his wife a check for $30, unaccompanied by any message whatsoever. On February 4 the libellee wrote the libellant as follows: "I received your check of $30.00 and was glad to get it. I expected a letter or a few lines from you. I thought you'll sent me more, so I can pay for my board and also the baby's things which the $30.00 is not enough. The only thing I ask you is to send me enough money to come home. So please think it over and let me know, or rather, you come down and talk about the matter. Please ans me without delay." Receiving no reply she again wrote him under date of February 14; and on February 23 he sent her another check for $30 with no letter enclosed. Another check of like amount, without any letter accompanying it, was sent by libellant to libellee under date of March 19. Later in March the libellant called on libellee at Tony Leandro's home in Kaimuki, where the libellee had been staying while in Honolulu, and asked her why she did not come home and according to his testimony her reply was, "You don't want me to and you didn't write."

According to libellant's testimony, after receipt of his wife's letter of February 4 he made preparations for her return to Lanai by purchasing groceries and restocking his pantry. He further testified that he went twice to the wharf at midnight to meet the incoming steamer from Honolulu, expecting her arrival thereon. The testimony shows that while in Honolulu the libellee was pregnant and that she gave birth to a child there on April 19, 1929. On October 21, 1928, her physician wrote to the libellant: "Mrs. Bartels has been here under treatment. She has symptoms of being pregnant and is threatened with a

miscarriage. She has bleeding from the uterus from time to time."

When asked what use she had made of the $30 sent her January 29, 1929, libellee testified: "I paid part of the board and bought things with it and that was not enough." Then the following colloquy occurred between the court and herself: the court: "Why didn't you go home?" A. "I wanted to go home but Bartels didn't want me home." Q. "Well, couldn't. you have gone?" A. "I couldn't make it at the time because I was under the doctor's care and being treated once a week on account of my condition."

On March 29 libellee wrote her husband, asking for more money. On May 7 she again wrote him, announcing the birth of her baby, whom she asked him to come and see, and concluding: "I would like you to send me more money than the usual amount, as I'm coming home."

On June 15, 1929, libellant went to Honolulu to attend a class reunion and was met by his wife at the wharf where a quarrel ensued between them during which the libellant said to his wife, "If you don't keep quiet I will smack your face." He testified: "I intended to do it, too—when my classmates who were there took me away." Following this testimony on cross-examination of the libellant the transcript shows the following questions and answers: "Q. What date was that? A. June 15th. Q. And right then and there you were—were you not—through with your wife? A. I was through; she didn't want to come home; she kept talking about coming home, but she didn't want to come home. Q. And you didn't want to take her home—did you? A. Not after a disgraceful thing like that."

On another occasion, on July 31, 1929, with reference to the same meeting, the same witness testified: "I have decided after the insults piled on me on June 15th and on

pier 12 that we will never live happily together and Mr. Vincent, attorney of Maui, has filed a suit for divorce."

On June 18, 1929, three days after the quarrel last above referred to, the libellee filed suit against her husband for separate maintenance, and upon motion for temporary allowance pending hearing the court entered an order therein on July 31, 1929.

The trial judge's decision in the case at bar makes no finding as to the exact date when the desertion period commenced, nor as to the specific acts of the parties or either of them which started the running of that period. The final decree in the divorce case brought upon the alleged adultery of the wife as above set forth was entered December 22, 1928, and there is no claim on the part of the libellant and no finding by the trial court that said desertion began before that date. Under the decision of this court in *Nishioka* v. *Nishioka,* 30 Haw. 595, the time of the pendency of the former divorce case, in the absence of bad faith in its institution, could have formed no part of the six months' desertion period referred to in the statute and would have prevented the completion of any such period begun but not terminated before that time. On January 10, 1929, as above set forth, the wife offered to come home and asked for money. Instead of accepting her offer, her husband one week later came to Honolulu, argued against her coming home because of adverse public opinion and the possibility of his losing his job if she did so, and by offers of aid tried to induce her to consent to a divorce. This effort was continued by letter of January 18 after his return to Lanai.

Up to January 17 at least, the husband was the offending party. Driving his wife from her home in the circumstances above set forth constituted desertion on his part (see *Hudson* v. *Hudson,* 21 Ann. Cs., 278, and footnotes on p. 281) which could be terminated only by him-

self. "The reasons which impel the courts to charge the husband with the duty of seeking the return of a wife who has left him without his own fault apply with greater force where her departure was due to misconduct on his part. He should make a special effort at reconciliation where he is not blameless for the separation." 9 R. C. L. 372. In the case at bar it was the deserted wife who made the first overtures and who insisted upon coming home despite all obstacles suggested by her husband. Whether or not the husband's retort: "All right; if you want to come home, come; I will send you the money," followed by the three remittances testified to, in the light of all the other circumstances above set forth, constituted such a "special effort at reconciliation" on the part of the offending spouse as to change his wife's continued residence in Honolulu thereafter into wilful and utter desertion on her part, it is unnecessary, in the view hereinafter expressed, for us to say. In the same view no opinion is required as to whether or not the wife's illness or the husband's conduct toward her on June 15 in the circumstances named was sufficient justification for her remaining longer in Honolulu. In any event there could have been no desertion on the wife's part before January 17 and probably not until receipt of her husband's first remittance of $30 on January 29. On June 18 she began the separate maintenance proceedings above referred to. This court has already held that (quoting from the syllabus) "the separation of one spouse from the other pending a *bona fide* suit between them for divorce is justifiable and therefore does not constitute desertion." *Nishioka* v. *Nishioka, supra.* Reasons for this rule are set forth in the opinion of the chief justice as follows (quoting from p. 597): "While there are authorities to the contrary, the weight of authority seems to me to be that the general rule is that during the pendency of a divorce suit the parties are

in the eyes of the law justified in living separate from each other. Their rights are under investigation by the court and neither should be prejudiced by compulsory cohabitation during that time. To require a wife to continue to cohabit with her husband after she brings a suit for divorce alleging that her husband is guilty of some marital offense or delinquency would be to place her in a disadvantageous position in so far as the credibility of her testimony is concerned. The judge conducting the trial may well feel that a wife's story of the husband's adultery or cruelty or nonsupport or desertion is exaggerated or untrue when he finds the libellant continuing to live with the libellee in all respects as his wife. So, also, her cohabitation with him after the institution of the suit may amount to condonation and deprive her of any preexisting right to a divorce."

The foregoing reasons why the pendency of a *bona fide* divorce suit should in the circumstances named postpone the running of a desertion period apply with equal cogency to the pendency of a suit for separate maintenance. Many courts have held that the parties to an action for separate maintenance must be living apart at the time the action is commenced. Where this is the rule the fact that the parties are not separated is a defense to the action. Living together may, as in divorce, constitute condonation; and condonation has been held to be a defense to a wife's action for separate maintenance. See cases cited in the footnotes of 6 A. L. R. on pp. 65, 67 and 70.

Whether or not separation in the instant case was a condition precedent to separate maintenance we need not decide. In any event the legal justification for such separation was a proper subject of inquiry in the separate maintenance proceedings and while that subject was thus *bona fide* at issue between the parties, it was not wilful

and utter desertion on the part of the wife to live separate and apart from her husband.

If the libellee deserted her husband, which we do not decide, on or after January 17, 1929, such desertion had not continued for a period of six months on June 18, 1929, the date of the institution of her separate maintenance proceedings. From June 18 to July 31, 1929, the latter being the date on which the libel herein was filed, said separate maintenance proceedings were pending. It is not claimed or proved that the same were begun or prosecuted in bad faith. As above set forth, the wife was justified in living apart from her husband during the pendency of said separate maintenance proceedings and her doing so therefore did not constitute wilful and utter desertion of her husband.

The proof in the particulars above set forth failing to show desertion of the husband by the wife for a continuous period of six months immediately or at any time preceding the date of the filing of the libel herein, the decree appealed from is reversed and the libel dismissed. A decree to this effect will be signed upon presentation.

*A. G. M. Robertson* (*E. Vincent* and *Robertson & Castle* on the brief) for libellant.

*H. E. Stafford* (also on the briefs) for libellee.